EXHIBIT A

**AFFIDAVIT IN SUPPORT OF SECONDED AMENDED
COMPLAINT FOR FORFEITURE**

I, Michael J. Hartwig, a Special Agent with the Federal Bureau of Investigation ("FBI"),
being duly sworn, state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have
been so employed since entering the FBI Academy in April 2008.  I am sworn and
empowered to investigate criminal activity involving violations of federal law.  I am
currently assigned to the FBI's Kansas City Division's Complex Financial Crimes Squad,
which investigates allegations of financial misconduct in violation of criminal law.  I have
investigated, in Western Missouri and Kansas, allegations of federal law violations,
including embezzlements, corporate fraud, mortgage fraud, securities fraud, public
corruption, and civil rights.  Many investigations include money laundering and other
sophisticated attempts to conceal the crime.

2.     This affidavit is made in support of a second amended complaint for forfeiture
for the following property:

> A.  Approximately $587,633.04 as substitute res for a parcel of property
> located at 8424 England Street, Overland Park, Kansas 66212; more fully
> described as Lot 21, Block 4, Galway Domains, a subdivision in the City
> of Overland Park, Johnson County, Kansas;
>
> B.  The contents of account number xxxxxxxx7707, styled as Tracey L.
> Karas, located at Bank of America;

1

C. Approximately $166,000 as substitute res for a 2021 Mercedes-Benz G63, VIN: W1NYC7HJ5MX365845.

3. Based on my training and experience, as well as the information set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343: Wire Fraud and 18 U.S.C. § 1957: Money Laundering (the "Target Offenses") have been committed by TRACEY LEIGH KARAS (hereinafter "KARAS") and these properties are subject to forfeiture to the United States.

4. The information set forth in this affidavit is based on my personal knowledge and observations during this investigation, information conveyed to me by other law enforcement officials, my review of records, documents, and other evidence obtained during the investigation. Additionally, unless otherwise indicated, wherever in this Affidavit I assert that an individual made a statement, that statement is described in substance herein and is not intended to be a verbatim recitation of such statement. The following is true to the best of my knowledge and belief.

**PROBABLE CAUSE**

5. KARAS is a 53-year-old female who resides at 8424 England Street, Overland Park, Kansas 66212; more fully described as Lot 21, Block 4, Galway Domains, a subdivision in the City of Overland Park, Johnson County, Kansas. For this affidavit, this residence is referred to as the SUBJECT PREMISES. KARAS has a criminal history that includes the following:

a. 1996 – Worthless Check in the State of Kansas,

b. 1997 – Impairing Secured Interest in the State of Kansas,

2

     c.  1997 – Felony Stealing in the State of Missouri and was sentenced to five

         years confinement,

     d.  2008 – Felony Theft of $25,000 or more in the State of Missouri, which was

         dismissed by the state,

     e.  2017 – Computer Unlawful Acts – Access without Authorization with

         damage less than $100,000; Theft by Deception – Value $1,500 to $25,000 in

         the State of Kansas and was sentenced to 8-months confinement.

6.     Based on information provided by Charlie Martin (hereinafter "Martin"), the owner of Thomas Martin Construction (hereinafter "TMC"), KARAS was hired on or about June 13, 2017, by Martin to work as an administrative assistant at TMC. At the time of the hire, Martin was unaware of KARAS' criminal record. Sometime in 2019, TMC needed to hire a new bookkeeper. At that time, KARAS told Martin she could take over the bookkeeper's responsibilities at TMC. According to Martin, KARAS did very good work and asked for additional responsibilities. KARAS was given project manager duties and was offered a salary. KARAS declined the salary, requesting to remain hourly. Martin agreed and increased KARAS' pay incrementally over time to as much as approximately $140 per hour. Pay periods were two-weeks long and KARAS averaged approximately 80 hours of work per pay period.

7.     Martin and TMC relied upon KARAS more and more as time went on to effectively run the financial aspects of much of TMC's day-to-day business. KARAS' responsibilities included, but were not limited to: presenting quotes to some of TMC's customers for requested construction work; purchasing needed materials and supplies for the

construction projects; retaining subcontractors as needed for the construction projects;

issuing invoices to TMC's customers for the construction projects; receiving invoices or pay

applications from subcontractors on the construction projects; receiving invoices from

suppliers for goods and materials needed for the construction projects; acquiring needed

goods and materials for the construction projects through the use of a corporate credit card;

and issuing TMC checks to pay the subcontractors, goods and material suppliers, and the

issuer of the corporate credit card.  Martin advised KARAS was also responsible for

submitting records, such as hours worked, to TMC's payroll processor for all TMC

employees, including for KARAS herself.

8.      In approximately September 2023, Martin grew concerned over recent

business losses at TMC and began a more thorough review of the backup documentation for

the various transactions handled by KARAS.  Martin hired an outside CPA and Business

Advisory Group to conduct a financial review of KARAS' wages over the prior two years,

and the various paid transactions completed by KARAS over the prior three years.

**Review by Outside Accountants/ Martin[1]**

9.      The investigations by Martin and/or the outside accountants

concluded, in part, as follows:

  a.   KARAS overpaid herself approximately $533,076.27 between November
       1, 2019 through October 31, 2023, above her established payroll amounts
       with TMC;

---

[1] This information was provided by Martin on February 22, 2024, and was used for reference.  The FBI conducted an independent analysis from records obtained via legal process and some of the numbers were different from what Martin provided.  The differences were attributable to the FBI including data from 2018, whereas Martin's analysis began in 2019.  In addition, the FBI used a different methodology when accounting for payroll taxes.  As a result, the FBI's loss amount for the Payroll Scheme was approximately $586,624.50 in gross terms, while the loss provided by Martin was $533,076.23.

    b.   KARAS made approximately $86,721.41 worth of improvements to the house in which she was living, and paid for the specific improvements by issuing TMC corporate checks and the use of a corporate credit card to pay for the materials, supplies, and contractors performing the work on the SUBJECT PREMISES, where KARAS was living; and,

    c.   KARAS made approximately $165,212.54 in additional improvements to the SUBJECT PREMISES and invoiced some of the costs to customers of TMC, which customers then paid the invoiced amounts to TMC.

10.    Neither TMC, nor Martin, authorized KARAS to pay herself the $533,076.27 in additional wages.

11.    Neither TMC, nor Martin, agreed to cover any costs associated with KARAS' improvements to the SUBJECT PREMISES, including but not limited to the $86,721.41 in improvements that Martin claimed KARAS paid for with TMC checks or the use of the TMC credit card.

12.    Neither TMC, nor Martin, agreed to allow KARAS to use TMC funds to cover any costs associated with improvements to the SUBJECT PREMISES where KARAS was living by billing the costs of those improvements to other customers of TMC, including by not limited to the $165,212.54 in improvement costs that KARAS billed to other TMC customers, which then paid for the invoiced amounts.

13.    The FBI independently obtained KARAS' payroll records from TMC's payroll provider, KARAS' known personal financial records, and TMC's business accounts. Based on a review of those records, and information provided by Martin, the FBI identified at least four schemes used by KARAS to allegedly defraud TMC. Those schemes include Payroll, Fraudulent Reimbursement, Invoice, and Credit Card schemes. Based on currently available records, it is believed the current loss amount from these alleged schemes is

approximately $865,395.59, which could increase as additional investigation is completed.

**Payroll Scheme**

14.    Martin provided a copy of an external accountant's report and supporting documents, dated December 21, 2023, to the FBI for review.  Based on that report, covering the review period of November 1, 2019, through November 1, 2023, consisting of 105 pay periods, the external accountants found KARAS received an additional 64 electronic paycheck deposits.  The additional hours paid per additional check varied from 0 to 152.5 hours, with 80 hours being the most common.  The total alleged overpayment to KARAS was approximately $533,076.27.

15.    During the same period, other than Martin (the owner of TMC), six other employees received a total of 12 additional checks during the review period.  The total for those additional 12 checks was $17,239.

16.    After learning of KARAS' embezzlement, Martin notified KARAS she was terminated from TMC and requested that KARAS return TMC property, to include a TMC owned laptop.  KARAS did not return the laptop and it is believed to still be in her possession.  Martin also suspended operations at TMC and told his two other employees they were being laid off due to TMC's lack of funds.

17.    Upon FBI review of KARAS' payroll records obtained directly from TMC's payroll processor and KARAS' personal bank account records, it appeared KARAS' scheme to defraud TMC through the payroll fraud scheme may have begun as early as January 2018, when KARAS submitted what appear to be inflated hours for time worked.  The FBI found KARAS caused herself to receive as many as 80 additional electronic paycheck deposits

while employed at TMC, causing her to receive approximately $559,324.50 in extra gross pay above her established payroll amounts.

18.    Martin advised KARAS submitted biweekly payroll to TMC's payroll provider, known to the FBI to be headquartered in Roseland, New Jersey, via phone call to an automated system.  Upon contacting a representative from the payroll provider, the FBI was advised all payroll clients submitted payroll information either via telephone or via online portal.  Therefore, Karas initiated an interstate wire transmission as part of the payroll process.

19.    In 2018, KARAS claimed at least 30 hours of overtime pay in 14 different pay periods, receiving a total of approximately $33,462 in extra gross pay over and above her established payroll amounts with TMC.

20.    In approximately seven different pay periods during 2019, KARAS received multiple electronic paycheck deposits for the given pay period.  For example, for the April 17, 2019, pay period, KARAS' payroll records reflect four payments, each for 80-hours of time worked, and each earning a gross pay of $3,120, resulting in a gross overpayment for that pay period of $9,360. (Three extra 80-hour entries, each resulting in $3,120 in gross pay.)  For 2019, the total overpayment to KARAS was approximately $31,200 in extra gross pay, over and above her established payroll amounts with TMC.

21.    In approximately four different pay periods in 2020, KARAS received multiple electronic paycheck deposits for the given pay period.  This resulted in approximately $17,600 in extra gross pay over and above her established payroll amounts with TMC.

22.    In approximately 16 different pay periods in 2021, KARAS received multiple electronic paycheck deposits for the given pay period. This resulted in approximately $141,400 in extra gross pay over and above her established payroll amounts with TMC.

23.    In approximately 21 different pay periods in 2022, KARAS received multiple electronic paycheck deposits for the given pay period. This resulted in approximately $156,062.50 in extra gross pay over and above her established payroll amounts with TMC.

24.    In approximately 18 different pay periods in 2023, KARAS received multiple electronic paycheck deposits for the given pay period. This resulted in approximately $179,600 in extra gross pay over and above her established payroll amounts with TMC.

25.    Based upon a review of payroll records, KARAS received a gross sum of $1,535,959.88, resulting in a total net pay of $1,216,091.03 while employed by TMC from 2017 through November 2023. These funds were electronically deposited into an account at Bank of America ("BOA") in KARAS' name, with an account number of xxxxxxxx7707, with a mailing address of the SUBJECT PREMISES. Based on payroll records obtained from TMC's payroll provider and information provided by Martin, a portion of these funds, equal to approximately $586,624.50, constitute alleged extra gross pay over and above her established payroll amounts with TMC. This resulted in extra net pay over and above her authorized payroll with TMC deposited to KARAS' BOA account xxxxxxxx7707 in the amount of approximately $473,377.69.

| Year | Number of Pay Periods with Inflated Salary | Extra Gross Pay Received | Extra Net Pay Received |
|------|---------------------------------------------|--------------------------|------------------------|
| 2018 | 14 | $61,542 | $46,408.86 |
| 2019 | 7 | $30,420 | $24,610.11 |
| 2020 | 4 | $17,600 | $14,214.90 |
| 2021 | 16 | $141,400 | $108,258.12 |

| 2022 | 21 | $156,062.50 | $135,518.98 |
| 2023 | 18 | $179,600.00 | $144,366.72 |
| **Total** | **80** | **$586,624.50** | **$473,377.69** |

26.   Based on a review of KARAS' BOA account records, KARAS used some of

the proceeds from the payroll scheme in the following ways:

    a.   On or about December 19, 2019, KARAS purchased a 2014 Mercedes-

        Benz G-Class, VIN: WDCYC70FXEX221051, from Anderson Auto Group

        of Lincoln, Nebraska for approximately $82,216.00.  As part of the purchase,

        KARAS received a trade in allowance of $42,000.00 for a 2014 Mercedes-

        Benz G-Class, VIN: WDCYC3HF1CX193706.  The remaining balance was

        financed with Capital One Auto Finance.  On or about December 18, 2019, a

        down payment of $20,000.00 was made to Anderson Ford from BOA account

        xxxxxxxx7707.

    b.   On or about September 19, 2022, KARAS purchased a 2021 Mercedes-

        Benz G-Class, VIN: W1NYC7HJ7MX422319, from Koons Tysons

        Toyota of Vienna, Virginia for approximately $234,620.66.  As part of the

        purchase, KARAS received a trade-in allowance of $82,000.00 for the

        2014 Mercedes-Benz G-Class, VIN: WDCYC70FXEX221051.  The

        remaining balance was financed with Toyota Financial Services.  On or

        about September 19, 2022, a down payment of $100,000.00 was made to

        Kline Tysons Imports Inc.[2]  from BOA account xxxxxxxx7707.  The

---

[2] Kline Tysons Imports Inc is the dba for Koons Tysons Toyota

financed balance in the amount of $52,933.04 was paid in whole on or about October 12, 2022, from BOA account xxxxxxxx7707.

c.  On or about March 17, 2023, KARAS purchased a 2021 Mercedes-Benz G-Class, VIN: W1NYC7HJ5MX365845, from Baron BMW of Merriam, Kansas for approximately $209,601.50.  As part of the purchase, KARAS received a trade-in allowance of $199,000.00 for the 2021 Mercedes-Benz G-Class, VIN: W1NYC7HJ7MX422319.  The remaining balance of $11,605.99 was paid in full to Baron BMW via electronic payment from BOA account xxxxxxxx7707.

d.  On or about June 25, 2022, KARAS purchased a 2022 Jeep Gladiator, VIN: 1C6JJTEGXNL127876, from Reed Jeep of Merriam, Kansas for approximately $60,730.00.  As part of the purchase, KARAS received a trade-in allowance of $23,000 for a 2004 Chevrolet SSR, VIN: 1GCES14P44B104997.  The remaining balance of $40,766.46 was paid to Reed Jeep from BOA account xxxxxxxx7707.  KARAS sold the Jeep Gladiator to Carvana on or about December 6, 2023, for approximately $41,666.00, and these proceeds were deposited into BOA account xxxxxxxx7707.

e.  Between January 2018 and December 2023, notable expenditures from KARAS' BOA account xxxxxxxx7707 could be placed into three distinct categories and corresponding aggregate totals for each category, as depicted in the following table:

| Category | Amount |
|---|---|
| Health and Wellness[3] | $287,084.25 |
| Jewelry[4] | $281,928.92 |
| Home Improvements[5] | $147,671.30 |

**Fraudulent Reimbursement Scheme**

27.     Based on the FBI's review of KARAS' BOA account xxxxxxxx7707, on

October 4, 2022, a check (#1854) from TMC's business checking account at Security Bank

(Account # xx0410) for $192,514.94 was written to KARAS and subsequently deposited

into KARAS' BOA account xxxxxxxx7707.  Martin was interviewed by the FBI regarding

this check.

28.     Martin advised that while he was out of town, TMC ran out of blank checks,

which were pre-signed to purchase project materials.  On September 30, 2022, KARAS

---

[3] Health and wellness includes expenditures from the following vendors: Adult & Pediatric Dermatology, Advanced Health Care LLC, Anesthesia Associate of KC, Associated Plastic Surgery, Caryn Health, Celsius Tannery, Coliseum Imaging Center,  Diagnostic Imaging Center, John Humphrey Jr. DDS, Kansas City Wellness, KC Bariatric, Laboratory Corporation, Madhukar Chhatre MD, Menorah Medical Center, Mid America Surgery, MP Pharmacy, Optum RX, Quest Diagnostics, Refresh Medical Center & Day Spa, Revive RX, Robert M Browne DDS, Skin RN KC, Sono Bello, South Kansas City Surgical, and Spine Align Chiropractic.

[4] Jewelry includes expenditures from the following vendors: Cali Jewelers, Eskews Fine Jewelers, Heartland Pawn & Jewelry, Helzberg Diamonds, Jewelry Doctors Inc, Joseph Diamonds LLC, Kay Jewelers, Kendra Scott, and Zales.

[5] Home Improvements expenditures include the following: Clearlight Infrared Sauna, Cody Beltz, Cover Care LLC, Crookham Construction,  Delta Plumbing, Eloy Perez, F&M General Labor, Fiber Swimming Pools, Floor & Décor, FS Swimming Pools, GB Construction, General Lawn & Tree Services, Horizon Lawn & Landscape, Jarod Befort, Justin Ward, K.D. Christian, Mirck Method, Nebraska Furniture Mart, Pyramid Roofing Co, RRC Framing, Regal Home Inspections, Silver Leaf Lawn, Suburban Lawn & Garden, Ted Goble, TG Heating & Cooling, The Tile Co, The Wallpaper Guy, United Heating & Cooling, and Weber Flooring.

wrote two personal checks totaling $192,514.94 to cover the cost of building materials. One check was to Pella Windows (Pella) for $117,869.94. The other was to Superior Electric Services (Superior) for $74,645.00. KARAS told Martin the two checks from KARAS' personal account (#1763 and #1764) were used to pay for the two invoices received by TMC from Pella and Superior.

29.    KARAS provided documentation to Martin via email. The documentation included scanned copies of the personal checks and the invoices. Believing KARAS' personal checks were payment of the Pella and Superior invoices on behalf of TMC, Martin authorized reimbursement in the amount of $192,514.94 to KARAS from TMC.

30.    Based on the FBI's review of KARAS' personal bank records, neither check (#1763 and #1764) were ever processed for payment by BOA. As such, KARAS appears to have fraudulently received reimbursement for an expense of $192,514.94 that she never actually incurred.

31.    There is probable cause to believe BOA checking account number xxxxxxxx7707, styled as Tracey L. Karas, contains funds directly traceable to the proceeds that KARAS unlawfully obtained from TMC. KARAS' account was opened in November 2008, in the name of Tracey L. Karas. The signature card for the account lists KARAS as the sole signor. An analysis of the account activities from January 2018 through December 2023 showed deposits of $2,343,168.84 of which at least $426,968.83 have thus far been identified as direct proceeds of KARAS' unlawful payroll scheme. Another $192,514.94 has been identified as direct proceeds from the fraudulent reimbursement check. The resulting total is approximately $619,483.77 in unlawfully obtained proceeds that were

deposited into KARAS' BOA account.[6]

32.     As of March 22, 2024, based on information obtained from BOA, the balance

of account number xxxxxxxx7707 was $142,791.12.

**Invoice Scheme**

33.     In addition to the above schemes, Martin alleges KARAS engaged in an

invoice scheme to have TMC customers pay for remodeling work done at her residence, the

SUBJECT PREMISES, in the amount of at least $63,292.03, billed to two different TMC

projects.[7]  Martin advised KARAS was not authorized to use TMC funds for work done at

the SUBJECT PREMISES.  Martin advised TMC, and specifically KARAS, used her TMC

email account to communicate with clients and subcontractors regarding the

sending/receiving of invoices and billing statements.  In addition, Martin alleges KARAS

overbilled a TMC customer by an additional $100,417.33, the purpose of this overbilling

and the subsequent use of these funds is yet to be determined.

**Project A**

| Subcontractor | Actual Cost to Project | Billed Amount | Amount Attributable to SUBJECT PREMISES |
|---|---|---|---|
| Sub 1 | $35,207.00 | $62,970.00 | $27,763.00 |
| Sub 2 | $27,100.00 | $57,831.19 | Yet to be determined |
| Sub 3 | $22,874.18 | $78,335.60 | Yet to be determined |
| Sub 4 | $56,200.85 | $70,425.57 | Yet to be determined |
| **Total** | **$141,382.03** | **$269,562.36** | **At Least $27,763.00** |

---

[6] Not all deposit information has been received from Bank of America. Bank of America is still working to produce missing deposit information for $525,553.79 out of the $2,434,403.01 in total deposits during the review period.

[7] TMC alleges KARAS' Invoice Scheme resulted in a loss of $165,212.54.  For this affidavit, the loss amount of $63,292.03 is based on currently available records.  Once records are obtained from additional entities, this amount could change, possibly increasing to the amount alleged by TMC.

34.     Customer 1 contracted TMC to manage Project A.  A TMC invoice dated August 4, 2022, to Customer 1 for Project A, contained itemized expenses for several contractors, totaling $335,584.31.  Martin located a second TMC invoice for this project with the same total.  One invoice included a "Misc" line item for $101,470.51.  The second invoice included allegedly inflated numbers for at least four of the subcontractors.  The chart above illustrates the actual invoice amounts for work performed by subcontractors, the billed amount of the invoices which include the inflated amounts, and the amount of the inflated invoices that have been determined, thus far, to have been used to pay for work performed at the SUBJECT PREMISES.

35.     Subcontractor 1 submitted a proposal dated June 1, 2022, to TMC for work associated with Project A in the amount of $35,207.  However, both TMC invoices for Project A to Customer 1 contained line items for work done by Subcontractor 1 in the amount of $62,970.  Martin located another proposal from Subcontractor 1, also dated June 1, 2022, in the amount of $62,970.  Martin believed the $62,970 proposal was modified because the line with the total amount was in a different font.  Martin believed KARAS was responsible for the modification.  I have reviewed both proposals and the one with the higher amount appeared to be altered.

36.     Subcontractor 1 then submitted two invoices to TMC for payment for completed work.  One was dated July 21, 2022, in the amount of $27,763, for work completed at the SUBJECT PREMISES.  The work done included 283 hours of labor, in the amount of $21,945 plus $5,818 for materials, supplies, equipment, and overhead. According to this invoice, the work completed was as follows:

"- Apply KemKromic $ two coats of oil to fence
- paint house with two coats; install trim
- caulk & paint; install tile sidewalk
- seal planters and fountain
- paint two coats to artwork in front and back yards
- paint exterior doors
- apply mud, sand, paint two coats on walls in Dining Room
- apply KemKromic and three coats DTM to garage door
- caulk and paint outside of new addition
- Flex seal driveway and garage floor"

37.    The second invoice submitted to TMC by Subcontractor 1 was dated August 8, 2022, in the amount of $35,207, for work completed on Project A. This amount matched the amount on what is believed to be the legitimate proposal from Subcontractor 1 for Project A.

38.    A check drawn on TMC's business account, dated September 7, 2022, was made payable to Subcontractor 1, in the amount of $62,970, with a memo indicating the payment was for work completed on Project A. However, the total payment was equal to the sum of the invoices for work done by Subcontractor 1 for Project A, in the amount of $35,207, and at the SUBJECT PREMISES, in the amount of $27,763.

39.    Subcontractor 2 submitted a proposal dated June 14, 2022, to TMC for work associated with Project A in the amount of $27,100. Martin located another proposal from Subcontractor 2, also dated June 14, 2022, in the amount of $57,831.19. Martin believed the higher proposal was modified because the line with the bid amount was in a different font. Martin believed KARAS was responsible for the modification. I have reviewed both proposals and the one with the higher amount appeared to be altered.

40.    Subcontractor 2 submitted an invoice to TMC on July 27, 2022, in the amount of $27,100 for work completed on Project A. This amount matched the amount on what is

believed to be the legitimate bid from Subcontractor 2 for Project A.

41.    A check drawn on TMC's business account, dated September 6, 2022, was made payable to Subcontractor 2, in the amount of $27,100, with a memo indicating the payment was for work completed on Project A.  However, Customer 1's payment to TMC for Project A included a line-item expense for Subcontractor 2 in the amount of $57,831.19.  It is yet to be determined why this project was allegedly overbilled by KARAS in the amount of $30,731.19.

42.    Subcontractor 3 submitted a proposal dated June 13, 2022, to TMC for work associated with Project A in the amount of $21,821.  Martin located another proposal from Subcontractor 3, also dated June 14, 2022, in the amount of $78,335.60.  Martin believed the higher proposal was modified because the line with the bid amount was in a different font.  Martin believed KARAS was responsible for the modification.

43.    Subcontractor 3 submitted an invoice to TMC on July 29, 2022, in the amount of $22,874.18 for work completed on Project A.  This amount matched the amount, plus tax, that was on what is believed to be the legitimate bid from Subcontractor 3 for Project A.

44.    A check drawn on TMC's business account, dated September 6, 2022, was made payable to Subcontractor 3, in the amount of $22,874.18, with a memo indicating the payment was for work completed on Project A.  However, Customer 1's payment to TMC for Project A included a line-item expense for Subcontractor 3 in the amount of $78,335.60.  It is yet to be determined why this project was allegedly overbilled by KARAS in the amount of $55,461.42.

45.    Subcontractor 4 submitted an estimate dated June 10, 2022, to TMC for work

associated with Project A in the amount of $43,331.86. Martin located another proposal

from Subcontractor 4, also dated June 14, 2022, in the amount of $70,425.57. Martin

believed the higher proposal was modified because the line with the bid amount was in a

different font and itemizations were missing. Martin believed KARAS was responsible for

the modification. I have reviewed both proposals and one appeared to be altered.

46.    Martin did not provide an invoice from Subcontractor 4 regarding the work

completed on Project A. However, a check drawn on TMC's business account, dated

August 16, 2022, was made payable to Subcontractor 4, in the amount of $56,200.71.

However, Customer 1's payment to TMC for Project A included a line-item expense for

Subcontractor 4 in the amount of $70,425.57. It is yet to be determined why this project

was allegedly overbilled by KARAS in the amount of approximately $14,224.72.[8]

47.    On September 6, 2022, TMC received payment from Customer 1 in the

amount of $335,584.31, equal to the entire invoiced amount for Project A. This amount

included $27,763 for work done at the SUBJECT PREMISES and alleged overbilling in the

amount of $100,417.33. The purpose of this alleged overbilling is yet to be determined.

The total of the work at the SUBJECT PREMISES plus the alleged overbilling is

$128,180.33.

## Project B

| Subcontractor | Actual Cost to Project | Billed Amount | Amount Attributable to SUBJECT PREMISES |
|---|---|---|---|

---

[8] One TMC invoice for Customer 1 listed a line-item expense for Subcontractor 4 in the amount of $70,425.57. The other TMC invoice for Customer 1 listed a line-item expense for Subcontractor 4 in the amount of $56,200.85. The overbilling amount of $14,224.72 was used as the difference between the two invoices. Had the difference between the higher amount billed ($70,425.57) and the amount paid by TMC to Subcontractor 4 ($56,200.71) been used, the difference would have been $14,224.86.

| | | | |
|---|---|---|---|
| Sub 1 | $58,403.00 | $72,218.00 | $13,815.00 |
| Sub 1 | $6,105.00 | $24,890.00 | $18,785.00 |
| Sub 5 | $0.00 | $2,929.03 | $2,929.03 |
| **Total** | **$64,508.00** | **$100,037.03** | **$35,529.03** |

48.     The chart above illustrates the actual invoice amounts for work performed by

subcontractors, the billed amount of the invoices which include the inflated amounts, and

the amount of the inflated invoices that have been determined, thus far, to have been used to

pay for work performed at the SUBJECT PREMISES.

49.     Martin located, and provided to the FBI, an invoice from Subcontractor 1

(same Subcontractor 1 as in Project A) to TMC dated October 26, 2022, for work done on

Project B in the amount of $72,218.  This invoice appeared to be altered as the total was in a

different font.  Martin located another invoice from Subcontractor 1 that was dated October

17, 2022, for work done at the SUBJECT PREMISES, in the amount of $13,815, with a

detailed description of the work done, which included $11,550 in labor and $1,802 in

materials, supplies, equipment, and overhead.  According to this invoice, the work

completed was as follows:

> "Caulk and paint exterior door trim; apply corner bead; tape and mud walls;
> sand, prime paint ceiling x2; paint walls; cut and install trim, caulk, putty,
> paint trim 2 coats; tape, mud, sand and paint x3 patches; spackle, sand, spot
> prime, cut in and roll walls; cut and notch trim for closet doors; install trim,
> caulk, putty and paint; cut & frame pass through door; sheet rock, tape, mud,
> trim, caulk, prime and paint."

50.     A check drawn on TMC's business account, dated November 9, 2022, was

made payable to Subcontractor 1, in the amount of $72,218.  Records provided by Martin

indicated this amount was for $13,815 for work done at the SUBJECT PREMISES plus

$58,403 for work done for Project B.  The sum of the payments for work done at the

SUBJECT PREMISES and Project B equals $72,218, the amount of the invoice that appeared to be altered for work done on Project B.

51.     Martin located, and provided to the FBI, another invoice from Subcontractor 1 to TMC dated December 16, 2022, for work done on Project B.  This invoice appeared to be altered as the detailed description of work to be done appeared to be deleted and the total was in a different font.  The total was listed as $23,700.  Martin located another invoice from Subcontractor 1 that was dated December 20, 2022, for work done at the SUBJECT PREMISES, in the amount of $18,785, with a detailed description of the work done, which included $15,400 in labor and $3,385 in materials, supplies, equipment, and overhead. According to this invoice, the work completed was as follows:

> "Prime and paint 2 candle stick holders; prime and paint 2 end tables and coffee table; scrape and paint glass for tables; remove countertops; cut down wall and re-frame; cut out backsplash and sheetrock; move outlets; re-sheetrock, tape, mud, sand and paint; remove cabinets, raise and level; install base below cabinets; cut and install 220 ft of quarter round; caulk and paint; cut and install shelves for closest in gym; build rack and hand from ceiling in garage; touch up paint fence; touch up walls."

52.     A check drawn on TMC's business account, dated January 30, 2023, was made payable to Subcontractor 1, in the amount of $24,890.  Records provided by Martin indicated this amount was for $18,785 for work done at the SUBJECT PREMISES plus $4,925 for Project B and $1,180 for work done at two other projects.  The sum of the payments for work done at the SUBJECT PREMISES and Project B equaled $24,890, the amount of the invoice that appeared to be altered for work done on Project B.

53.     On July 20, 2023, Subcontractor 5 submitted an invoice to KARAS for work done at the SUBJECT PREMISES, in the amount of $2,929.03.  On July 26, 2023, a TMC check was made payable to Subcontractor 5, in the amount of $2,929.03, with a memo line

indicating the payment was associated with TMC Project B.

54.    The total for work performed by TMC subcontractors at the SUBJECT

PREMISES and subsequently invoiced to and paid for by TMC clients was approximately

$63,292.03.

### Credit Card Scheme

55.    TMC provided KARAS with two company credit cards to use for company

expenses.  Martin reviewed TMC's credit card statements and found KARAS made personal

purchases for jewelry, food, and other household items.  Martin prepared a spreadsheet of

unauthorized credit card purchases made by KARAS, which totaled approximately

$24,009.23.  Martin included unauthorized food expenses in his calculation, but advised he

often allowed for KARAS to purchase meals.  For this affidavit, alleged unauthorized food

expenses are not included.

56.    FBI investigators independently obtained TMC's credit card statements to

verify the charges identified by Martin.  The following is an itemized list of significant

unauthorized charges, totaling $50,264.12, made by KARAS, identified by Martin, and

confirmed on the independently obtained TMC financial statements:

> a.  April 24, 2021 - $1,994.66 at "052 – Helzberg Diamonds".
>
>    According to records obtained from Helzberg Diamonds, on April
>
>    24, 2021, KARAS purchased three items and three lifetime care
>
>    plans for a total of $1,994.66.
>
> b.  May 1, 2021 - two transactions totaling $4,998.65 at "Zales #1735".
>
>    According to records obtained from Zales, on May 1, 2021,

KARAS purchased nine items in two transactions from the Zales jewelry store, located inside Oak Park Mall in Overland Park, Kansas.

c. March 4, 2022 - $24,355.98 at "HCM*SLEEK FENCE". Martin advised this purchase was not associated with any TMC projects. Open-source information indicated Sleek Fence sells a variety of aluminum privacy style fences. Physical surveillance conducted at the SUBJECT PREMISES indicated a fence was present that matched the style of fences sold by Sleek Fence.

d. April 5, 2022 - $4,000 at "FIBER SWIMMING POOLS". Martin advised this purchase was not associated with any TMC projects. Publicly available ariel photography indicated an outdoor pool was present at the SUBJECT PREMISES.

e. March 21, 2023 - $5,914.83 at "Black Jack Truck Access". According to open-source information, Blackjack Truck Accessories is in Lee's Summit, Missouri, and supplies vehicle accessories.

f. August 12, 2023 - $9,000.00 at "Zales #1735". According to records obtained from Zales, on August 12, 2023, KARAS placed a "special order" for an item, described as Diamond Band Number: 01735010225852, with a retail value of $39,999.70 at the Zales jewelry store, located inside Oak Park Mall in Overland Park,

Kansas. The receipt indicated a 10 percent discount and two

payments. One payment was made in the amount of $9,000.00

using the TMC credit card and another payment in the amount of

$20,591.79 was made using a debit card for BOA account

xxxxxxxx7707. Zales advised KARAS cancelled this item before it

arrived at the store. KARAS then used a debit card for BOA

account xxxxxxxx7707 to purchase the item when it arrived for a

sale price of $23,999.82. Also included in the transaction were a

Lifetime Protection plan in the amount of $534.99 and a credit for a

pre-owned item in the amount of ($3,999.99) for a total purchase

price, to include tax, in the amount of $22,506.16. The $9,000

charge to the TMC credit card was not credited back to the account.

| Date | Description | Amount |
|---|---|---|
| 4/24/2021 | Helzberg Diamonds | $1,994.66 |
| 5/1/2021 | Zales | $4,998.65 |
| 3/4/2022 | Sleek Fence | $24,355.98 |
| 4/5/2022 | Fiber Swimming Pools | $4,000.00 |
| 3/21/2023 | Black Jack Truck Access | $5,914.83 |
| 8/12/2023 | Zales | $9,0000.00 |
| **Total** | | **$50,264.12** |

**Karas Residence**

57.     On October 19, 2011, Tracey Karas, a single person, purchased 8424 England

Street, Overland Park, Kansas, from John D. Hudson and Sofia Ann Hudson.

58.     On April 17, 2012, Tracey Karas transferred 8424 England Street, Overland Park,

Kansas, to the Meinhardt Family Irrevocable Trust.

59.     Based on the FBI's review of records for KARAS' BOA account number

xxxxxxxx7707, beginning in September 2018, KARAS began to spend substantial amounts on

home renovations.

| Date | Vendor | Check # | Check Memo | Amount |
|------|--------|---------|------------|--------|
| 4/4/2022 | Cody Beltz | 1750 | Fence | $2,000.00 |
| 4/4/2022 | Justin Ward | 1751 | Fence | $3,000.00 |
| 4/4/2022 | Jarod Befort | 1752 | Fence | $7,730.00 |
| 4/11/2022 | Justin Ward | 1753 | Fence | $500.00 |
| 4/11/2022 | Cody Beltz | 1754 | Fence | $500.00 |
| 7/12/2022 | FS Swimming Pools | 1760 | | $26,942.13 |
| 7/14/2022 | G B Construction | 1759 | Retaining Wall/ Gym | $19,776.66 |
| 8/4/2022 | Fiber Swimming Pools | | | $4,000.00 |
| 8/4/2022 | FS Swimming Pools | | | $7,220.31 |
| 8/15/2022 | Cover Care LLC | | | $4,868.50 |
| 8/31/2022 | Clearlight Infrared Sauna | | | $6,224.00 |
| 10/6/2022 | Clearlight Infrared Sauna | | | $1,394.00 |

60.     In 2023, KARAS' last year of employment at TMC, the following home

renovations, believed to be completed at the SUBJECT PREMISES, were paid using funds from

BOA account xxxxxxxx7707.

| Date | Vendor | Check # | Check Memo | Amount |
|------|--------|---------|------------|--------|
| 2/27/2023 | General Lawn & Tree Services | 1772 | Tree at Street | $1,900.00 |
| 7/10/2023 | United Heating & Cooling | 1776 | | $299.00 |
| 7/26/2023 | Crookham Construction | 1777 | Tunnel Lights | $4,730.00 |

| 9/1/2023 | Cover Care LLC | 1783 | Final Payment | $4,868.50 |
|---|---|---|---|---|
| 10/2/2023 | Cover Care LLC | | | $2,518.70 |
| 10/26/2023 | Cover Care LLC | 1785 | | $2,388.24 |
| 12/8/2023 | K.D.Christian | 1789 | | $5,909.02 |
| 12/15/2023 | The Tile Co. | 1791 | | $12,528.00 |

## CONCLUSION

61.     Based on the foregoing, I have probable cause to believe that KARAS engaged in several wire fraud schemes to defraud Martin and TCM.  Approximately $665,892.63 in proceeds from the payroll scheme and reimbursement scheme were deposited in KARAS' BOA account number xxxxxxxx7707.  KARAS then used some of these proceeds to pay for improvements to the property located at 8424 England Street, Overland Park, Kansas as set out in paragraphs 59 and 60.  KARAS also used the Invoice Scheme to have improvements done at the property.

62.     Additionally, I have probable cause to believe that the improvements made to 8424 England Street, Overland Park, Kansas as detailed herein constitute proceeds traceable to KARAS' wire fraud schemes.  Accordingly, the real property up to the value of the traceable proceeds, is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

63.     I also have probable cause to believe that violations of 18 U.S.C. § 1957 have occurred based upon the following transactions as set out in paragraphs 59 and 60:  check no. 1759 in the amount of $19,776.66; check no. 1760 in the amount of $26,942.13; and check no. 1791 in the amount of $12,528.00.  As these checks, which contained more than $10,000 in

proceeds derived from KARAS' wire fraud schemes, were used to purchase home improvements to 8424 England Street, Overland Park, Kansas, this real property, is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in money laundering transactions.

64.    Based on the foregoing, KARAS also used some of the proceeds deposited into BOA account number xxxxxxxx7707 to purchase the 2021 Mercedes-Benz G63 with VIN: W1NYC7HJ5MX365845 and the 2019 Mercedes that was traded in for the 2021 Mercedes. Accordingly, the 2021 Mercedes-Benz G63 with VIN: W1NYC7HJ5MX365845 is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as it constitutes proceeds traceable to violations of 18 U.S.C. § 1343. This vehicle is also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), because the vehicle constitutes property involved in a violation of 18 U.S.C. § 1957. The monetary transaction that violated 18 U.S.C. § 1957 was the $11,605.99 paid to Baron BMW to finish paying for the 2021 Mercedes-Benz G63, VIN: W1NYC7HJ5MX365845.

65.    Furthermore, the contents of KARAS' BOA account number xxxxxxxx7707, constitutes proceeds derived from her wire fraud schemes and are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 984. This account is also subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as it constitutes property involved in money laundering transactions in violation of 18 U.S.C. § 1957. The account was involved in the purchase of all the vehicles as set out in paragraph 26 and the receipt of the funds from the sale of the 2022 Jeep Gladiator.

66.    Since the date of the original complaint filed in this case, the property located at 8424 England Street and the 2021 Mercedes-Benz were sold by interlocutory sale. The proceeds from those sales have been substituted for the original two properties.

Michael Hartwig
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 22nd day of April, 2025.

NOTARY PUBLIC

My commission expires 7/13/2027.